UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ARASH ETEGHAEI, et al.,

          Plaintiffs,

    v.

COUNTY OF ALAMEDA, et al.,

          Defendants.

Case No.  22-cv-04298-KAW

**ORDER GRANTING UNIVERSITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART ALAMEDA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 114, 117

Plaintiffs Arash Eteghaei and Mitra Zade filed the instant case, alleging violations of their civil rights by Defendants County of Alameda, Matthew Farruggia, Scott Brandon, Riley Walter, Ahmad Mateen, Joshua Dormer, Marvin Moncada, and Joshua Armijo (collectively, "Alameda Defendants"), as well as the Regents of the University of California ("UC Regents"), Gherrett Levette, Kovena Avila, and Arlene Samaniego (collectively, "University Defendants").  Pending before the Court are: (1) the University Defendants' motion for summary judgment, and (2) the Alameda Defendants' motion for summary judgment.  (University Defs.' Mot. for Summ. J., Dkt. No. 114; Alameda Defs.' Mot. for Summ. J., Dkt. No. 117.)

Having considered the parties' filings, the relevant legal authorities, and the arguments made at the October 3, 2024 hearing, the Court GRANTS the University Defendants' motion for summary judgment and GRANTS IN PART and DENIES IN PART the Alameda Defendants' motion for summary judgment.

## I.    BACKGROUND

The instant case concerns Defendants' execution of an arrest warrant for Plaintiff's adult son, Arian Eteghaei, and a related search warrant for Plaintiffs' home in November 2021.  (Fourth Am. Compl. ¶¶ 1, 29, Dkt. No. 75.)  Arian has been charged with felony sexual assault of eleven

women while a student at the University of California, Santa Barbara.  (*See* Alameda Req. for Judicial Notice ("RJN"), Exh. A (affidavit in support of Oct. 29, 2021 search and arrest warrant) at COUNTY000023-26).[1])  Several of the charged assaults involved the use of violence, including strangulation.  (*Id.* at COUNTY000024-25.)

On August 13, 2021, Defendants Avila and Samaniego -- the investigating detectives – first arrested Arian at the Oakland Airport.  (Bernal Decl., Exh. 11 ("Samaniego Dep.") at 16:22-17:16; Exh. 12 ("Avila Dep.") at 13:7-15:1.)  During the arrest, Plaintiff Zade started yelling and screaming, falling to the floor.  (Samaniego Dep. at 18:21-23, 65:11-14; Avila Dep. at 16:14-17:5.)  Arian was released on bail and placed on house arrest, residing in Plaintiffs' home in Dublin, California.  (Bernal Decl., Exh. 1 ("Zade Dep. Part I") at 21:4-10; Exh. 2 ("Eteghaei Dep. Part I") at 21:17-22.)

Following Arian's arrest, Defendants Avila and Samaniego continued investigating and learned of other victims; on October 29, 2021, they obtained a search warrant for Plaintiffs' home and an arrest warrant for Arian.  (*See* Alameda RJN, Exh. A; Avila Dep. at 57:13-19.)  That same day, Defendant Samaniego contacted the Alameda County Sheriff's Office to coordinate the execution of the warrants, as Dublin is within Defendant Alameda County's jurisdiction.  (Bernal Decl., Exh. 4 ("Moncada Dep.") at 10:11-11:2; Moncada Decl. ¶ 2, Dkt. No. 117-2.)  Defendant Samaniego sent a draft operations plan, which included the following background information: "Sexual assault suspect of 11 Victims; Prior arrest for sexual assault on 8/13/21.  Lives with parents and possibly elderly grandparents.  Father is JAMSHID ARASH ETEGHAEI DOB: 08/10/1970, and Mother Mitra Zade DOB: 08/07/1969."  (Moncada Decl., Exh. F at F-03.)  The draft operations plan stated that a records check on Arian and Plaintiffs indicated "NO WEAPONS," and that "[n]o weapons registered to the suspect and parents."  (Moncada Decl., Exh. F at F-03.)  Defendant Samaniego also included the warrants, which had a picture of Arian.

United States District Court
Northern District of California

---

[1] The Court takes judicial notice of the search warrant and supporting affidavit.  "Courts regularly find that search warrants are public records properly subject to judicial notice."  *Ferguson v. Cal. DOJ*, No. 16-cv-06627-HSG, 2017 U.S. Dist. LEXIS 103094, at *3 (N.D. Cal. July 4, 2017); *see also Leubner v. Cty. of Lake*, No. 18-cv-05654-PJH, 2020 U.S. Dist. LEXIS 108920, at *5 n.2 (N.D. Cal. June 22, 2020) (taking judicial notice of a search warrant and supporting affidavit).

1    (Moncada Decl., Exh. F at F-41.)

2         On November 2, 2021, the officers attended a planning meeting at Dublin Police Services.

3    (Bernal Decl., Exh. 5 ("Farruggia Dep.") at 8:18-9:23; Samaniego Dep. at 50:2-9.)  At the

4    planning meeting, the Alameda County Sheriff's Office presented a risk assessment and

5    operations plan, which had been drafted by Defendant Moncada.  (Bernal Decl., Exh. 4

6    ("Moncada Dep.") at 74:20-75:1, 76:7-10; Exh. 13 ("Levette Dep.") at 23:3-7; Samaniego Dep. at

7    50:22-24.)  Defendant Moncada based the risk assessment and operations plan on Defendant

8    Samaniego's draft operations plan; the risk assessment characterized the operation as "Low" risk.

9    (Moncada Dep. at 75:17-23; Moncada Decl. ¶ 3, Exh. G at 1.)  Defendant Moncada's operations

10   plan included personnel assignments, which placed the individual University Defendants on the

11   perimeter, as well as equipment use, such as rifles, a ram, and cutters.  (Moncada Decl., Exh. G at

12   6-8.)  The individual University Defendants did not provide comments on the operations plan.

13   (Moncada Dep. at 76:11-15; Levette Dep. at 26:8-25.)

14        Following the operational meeting, the individual Defendants executed the warrants.

15   (Moncada Decl. ¶ 5.)  Defendants Walter, Brandon, Dormer, Farruggia, and Moncada, along with

16   Officers White and Mangano, gathered around the corner from Plaintiffs' residence.  (Moncada

17   Decl. ¶ 5; Mangano Decl. ¶ 3, Dkt. No. 117-3.)  They were then joined by Defendants Mateen and

18   Armijo, as well as Deputy Gore.  (Mateen Decl. ¶ 3, Dkt. No. 117-3; Armijo Decl. ¶ 3, Dkt. No.

19   117-3.)  The individual University Defendants were stationed at the back of the house.  (Avila

20   Dep. at 30:12-17 (stating she was located to the rear of the residence, about one house back);

21   Samaniego Dep. at 43:13-19 (stating she was behind the house, about a block away); Levette Dep.

22   at 11:10-15 (stating he was located at the rear of the residence).

23        While arriving at Plaintiffs' residence, Defendant Mateen called Plaintiff Eteghaei's cell

24   phone, informed him that the Alameda County Sheriff's Office was executing a search warrant,

25   and instructed him to have all occupants exit the residence with nothing in their hands.  (Mateen

26   Decl. ¶ 3; Armijo Decl., Exh. M ("Armijo Body Camera") at 16:35-16:36.[2])  Around this time, the

_____

[2] The Court relies on the timestamp in the body camera footage.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   officers began to approach Plaintiffs' residence.  (Walter Decl. ¶ 4, Dkt. No. 117-3; Moncada

2   Decl. ¶ 6.)  Defendant Armijo also used a bullhorn to instruct the occupants to exit with nothing in

3   their hands.  (Armijo Decl. ¶ 4; Armijo Body Camera at 16:35-36.)  During Defendant Armijo's

4   first announcement, an airhorn went off in another vehicle.[3]  (Armijo Decl. ¶ 4.)  After the airhorn

5   was turned off, Defendant Armijo made a second announcement, instructing the occupants to exit

6   with nothing in their hands.  (Armijo Decl. ¶ 4; Armijo Body Camera at 16:35-36.)

7        At approximately 9:36 a.m., Plaintiff Eteghaei exited the home, with a cell phone in his

8   hand; Plaintiff Zade was not far behind him, recording the interaction on her cell phone.  (Walter

9   Decl. ¶ 5, Dkt. No. 117-3, Exh. L ("Walter Body Camera") at 16:36; Moncada Decl. ¶ 7, Exh.

10  ("Moncada Body Camera") at 16:36.)  Defendant Walter had his rifle pointed in Plaintiffs'

11  direction as he and Defendant Moncada gave them instructions, including to put their hands up, to

12  stop, and to put down their phone.  (Moncada Body Camera at 16:36.)  During this time,

13  Defendant Dormer and Officer White were holding pistols, which were pointed upwards, while

14  Defendant Mateen had his rifle pointed at the residence's second story windows. (*See* Dormer

15  Decl., Exh. O ("Dormer Body Camera")at 16:35-36; Mateen Decl., Exh. J ("Mateen Body

16  Camera") at 16:35-36.)  The officers backed up as Plaintiff Eteghaei followed their instructions to

17  walk towards them.  When Plaintiff Eteghaei got closer to the officers, Defendant Walter lowered

18  his rifle for several seconds before bringing it back up to point at Plaintiff Eteghaei's head.

19  (Moncada Body Camera at 16:36; Rahman Decl., Exh. 1 ("Security Footage"), Dkt. No. 122-1.)

20  At the end of the driveway, Defendant Walter again lowered his weapon and Defendant Dormer

21  handcuffed Plaintiff Eteghaei.  (Moncada Body Camera at 16:36; Dormer Decl. ¶ 7, Dkt. No. 117-

22  3.)  Officer Mangano led him away towards the police vehicles.  (Mangano Decl. ¶ 5, Dkt. No.

23  117-3.)  Arian then exited the residence and walked towards the officers, where he was handcuffed

24  and escorted away.  (Moncada Decl. ¶ 10; Moncada Body Camera at 16:37.)

25        During this time, Plaintiff Zade was still on the porch.  (Moncada Decl. ¶ 9; Moncada

26

27  _____

28  [3] The Alameda Defendants assert that an equipment malfunction in Deputy Gore's vehicle caused
    an airhorn to sound, but provide no evidence in support regarding a malfunction.  (*See* Alameda
    Defs.' Mot. for Summ. J. at 7.)

Body Camera at 16:36-38.)  Although officers repeatedly ordered Plaintiff Zade to come towards them, Plaintiff Zade stayed on the porch, tried to make a phone call, and made to go back in the house.  (Moncada Decl. ¶ 9; Moncada Body Camera at 16:36-39.)  Detective Mateen, a Farsi speaker, tried to get her to comply by speaking to her in both English and in Farsi, but she did not.  (Mateen Decl. ¶ 4; Mateen Body Camera at 16:38.)  The officers ultimately approached Plaintiff Zade on the porch, and Defendant Brandon handcuffed her.  (Moncada Decl. ¶ 11, Moncada Body Camera at 16:38-39; Mateen Decl. ¶ 5; Mateen Body Camera at 16:38-39; Brandon Decl. ¶ 5, Dkt. No. 117-3, Exh. P ("Brandon Body Camera") at 16:39.)

Defendants Brandon and Mateen escorted Plaintiff Zade down the driveway, during which she briefly sat back on the ground before being taken to the patrol vehicle.  (Mateen Decl. ¶ 5; Mateen Body Camera at 16:39; Brandon Decl. ¶ 5; Brandon Body Camera at 16:39.)  There, Plaintiff Zade gasped for air as she yelled at the officers.  (Mateen Decl. ¶ 6; Mateen Body Camera at 16:39-40.)  She was taken to the patrol vehicle that Plaintiff Eteghaei was in; she refused to sit inside of the vehicle, claiming she was claustrophobic and that the vehicle was too hot, yelled at the officers, slipped out of her cuffs (requiring Defendant Mateen to reapply them), repeatedly cried out that she could not breathe, begged the officers to bring her dog to the vehicle after the dog got out of the house (which they did), and got out of the car and fell to the ground, crying for her son.  (Mateen Decl. ¶ 6; Exh. J ("Mateen Body Camera 2") at 16:43-48; Mangano Decl. ¶ 6; Exh. I ("Mangano Body Camera") at 16:39-53.)

Around 9:52 a.m., the individual University Defendants arrived at the front of the house.  (Mateen Body Camera 2 at 16:52.)  None of the individual University Defendants had seen any rifles being pointed at Plaintiffs.  (Samaniego Dep. at 68:21-23, 71:8-12; Avila Dep. at 98:15-18; Levette Dep. at 33:17-23, 36:15-25.)  They observed Plaintiff Zade in handcuffs; Defendant Samaniego observed Plaintiff Zade making threats towards Defendant Avila, saying at least three to four times: "You're going to pay, Kovena Avila."  (Samaniego Dep. at 61:23-62:6.)  When Plaintiff Zade was escorted towards Defendant Samaniego, Defendant Avila, and Sergeant Levette, she was still in an agitated state; when somebody asked if the handcuffs should be removed, Defendant Samaniego felt it would not be safe, so she said no because of the threats she

was making and her familiarity with Plaintiff Zade from the airport.  (Samaniego Dep. at 62:7-18.)

After the officers cleared the house, Plaintiff Eteghaei was escorted to the house and uncuffed, and permitted to sit on the sofa; Plaintiff Eteghaei was handcuffed for approximately eighteen minutes.  (Mateen Decl. ¶ 7; Moncada Decl. ¶ 13; Moncada Body Camera at 16:54-56.)  Defendant Mateen asked Plaintiff Zade if she wanted to sit in the vehicle, but she replied, "I want to be with my son."  (Mateen Decl. ¶ 7.)  The officers kept Plaintiff Zade in handcuffs so that she could be close to Arian and not obstruct the search.  (Mateen Decl. ¶ 8; Mangano Decl. ¶ 8.)  She eventually sat in the driveway of a neighbor's home crying, where she complained the handcuffs were "so tight."  (Mateen Decl. ¶ 8; Mangano Decl. ¶ 8; Mangano Body Camera at 16:59.)  Defendant Mateen checked the handcuffs, demonstrating that he could put a finger through them.  (Mateen Decl. ¶ 8; Mangano Decl. ¶ 8; Mangano Body Camera at 16:59-17:00.)

At approximately 10:15 a.m., Plaintiff Zade was permitted to return to her residence, where she yelled at the officers about their failure to show them the search warrant.  (Mangano Decl. ¶ 9; Mangano Body Camera at 17:15-21.)  Around 10:21 a.m., after the University Defendants had concluded their search, Plaintiff Zade was uncuffed.  (Mangano Decl. ¶ 10; Brandon Body Camera at 17:21.)  In total, Plaintiff Zade was handcuffed for approximately forty-three minutes.  (Brandon Decl. ¶ 7.)  Ultimately, the execution of the warrants at Plaintiffs' residence took less than fifty minutes.  (*See* Dormer Body Camera (showing approach of residence at 9:34 a.m. and departure at 10:22 a.m.).)

On June 21, 2022, Plaintiffs filed the instant action.  (*See* Dkt. No. 1.)  Following multiple motions to dismiss, Plaintiffs filed the operative complaint on July 20, 2023, alleging the following claims: (1) § 1983 claim for excessive force, (2) supervisory liability as to Defendants Farruggia, Levette, Samaniego, and Avila, (3) § 1983 claim for unreasonable seizure, (4) violation of California Constitution, article 1, § 13, (5) violation of California Civil Code § 52.1, (6) conspiracy to violate California Civil Code § 52.1, (7) negligent hiring, training, and supervision as to Defendants Farruggia and Mateen, (8) assault, (9) battery as to Defendants Dormer and Brandon, (10) intentional infliction of emotional distress, (11) negligent infliction of emotional distress, (12) negligence, (13) false imprisonment, (14) false arrest, and (15) violation of

6

United States District Court
Northern District of California

1  California Government Code § 7286(b)(5) as to Defendant County of Alameda.  On July 22, 2024,

2  Defendants filed their motions for summary judgment.[4]  On August 6, 2024, Plaintiffs late-filed

3  their opposition, which included only a single, unsigned declaration by Muhammed F. Rahman,

4  attaching security camera footage of the incident.[5]  (Pls.' Opp'n, Dkt. No. 122.)  On August 12,

5  2024, Defendants filed their replies.  (University Defs.' Reply, Dkt. No. 125; Alameda Defs.'

6  Reply, Dkt. No. 126.)

7  ## II.   LEGAL STANDARD

8          A party may move for summary judgment on a "claim or defense" or "part of... a claim or

9  defense." Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when, after adequate

10  discovery, there is no genuine issue as to material facts and the moving party is entitled to

11  judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

12  Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,*

13  477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient

14  evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

15          A party seeking summary judgment bears the initial burden of informing the court of the

16  basis for its motion, and of identifying those portions of the pleadings and discovery responses

17  that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Where

18  the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no

19  reasonable trier of fact could find other than for the moving party. *Southern Calif. Gas. Co. v. City*

20  *of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

21  _____

22  [4] In support of their motion, the University Defendants provided over 2,200 pages of exhibits,
   including the entirety of thirteen deposition transcripts and the 531-page University of California,
23  Santa Barbara Policy Department Policy Manual (of which the University Defendants cite exactly
   two pages).  Such overlarge exhibits are wholly unnecessary, and the Court will not review any
24  page that is not specifically cited in the University Defendants' briefs.

25  [5] On August 11, 2024, *one day* before the replies were due, Plaintiffs purported to file a
   "corrected" opposition.  (Dkt. No. 124.)  The opposition included eight additional exhibits.  (Dkt.
26  No. 124-2.)  The Court subsequently ordered Plaintiff to file a redline version of the "corrected"
   opposition, comparing it to the original opposition.  (Dkt. No. 127.)  The redline version made
27  apparent that there were numerous changes to the brief.  (Dkt. No. 128-1.)  As the Court
   previously stated, it will not consider any new arguments or evidence in the "corrected"
28  opposition.  (Dkt. No. 127.)

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production by either (1) "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *see also Celotex*, 477 U.S. 324-25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250. "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment. *Anderson,* 477 U.S. at 254. "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (citations and quotations omitted). The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

## III.    DISCUSSION

### A.    Additional Discovery

Plaintiffs argue that if the Court intends to grant Defendants' motions for summary judgment, Plaintiffs request time to conduct discovery about: (1) whether the forensic analysis by videographer Marsh is accurate, and (2) whether the psychiatric report of Dr. Yanofski is accurate. (Pls.' Opp'n at 25.) Plaintiffs provide <u>no</u> explanation for why this proposed discovery is necessary to oppose summary judgment. In any case, the Court does not rely on the forensic analysis by

8

1    videographer "Marsh" or the psychiatric report of Dr. Yanofski; it is not clear what these exhibits

2    are or if they were even provided by the parties.[6]  The Court finds there is no need for the

3    requested discovery to decide the motions for summary judgment.

4    **B.    Claims 1 and 3: 42 U.S.C. § 1983 – Violation of Fourth Amendment Rights**

5    **i.    Unreasonable Seizure**

6        Here, Plaintiffs assert that Defendants committed an unreasonable seizure when: (1) the

7    Alameda Defendants detained Plaintiffs in handcuffs outside their home, and (2) Defendant

8    Samaniego told the other officers to keep Plaintiff Zade in handcuffs.  (Pls.' Opp'n at 4, 22-23.)

9        **a.    Alameda Defendants**

10        In general, "[p]olice may detain persons without probable cause while executing a search

11   warrant if justified by the circumstances."  *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003)

12   (citing *Michigan v. Summers*, 452 U.S. 692, 704-05 (1981)).  A detention, however, "may be

13   unlawful under the Fourth Amendment either because the detention itself is unreasonable or

14   because it is carried out in an unreasonable manner."  *Id.*  Thus, "[b]ecause handcuffing

15   substantially aggravates the intrusiveness of a detention, it follows that circumstances which

16   would justify a detention will not necessarily justify a detention by handcuffing."  *Id.* at 1063.

17   Instead, handcuffing must be "justified by the totality of the circumstances."  *Id.*

18        Plaintiffs argue that per *Meredith*, there is a factual dispute as to whether the Alameda

19   Defendants' decision to handcuff Plaintiffs was reasonable.  (Pls.' Opp'n at 4-5.)  In *Meredith*,

20   thirteen officers were executing a warrant to search a three-story building for evidence of income

21   tax violations.  342 F.3d at 1059.  During the search, several officers encountered the plaintiff,

22   who told the officers that the search was illegal and asked to see the search warrant.  *Id.* at 1060.

23   The Ninth Circuit found that these circumstances did not justify the plaintiff's handcuffing

24   because there was no reason to believe that the occupants were dangerous, the investigation was

25   for nonviolent felonies, and the plaintiff was not a serious impediment to the search or a threat to

26

27   ───────────────
     [6] The Alameda Defendants appear to believe the "Marsh" forensic analysis may refer to the video
     created by Parris Ward, which synchronizes together Mr. Rahman's security camera footage,
28   Plaintiff Zade's cell phone footage, and body camera footage to show different angles of when
     Plaintiffs were on the porch.

the officers.  *Id.* at 1063.

The Alameda Defendants, in turn, point to *Muehler v. Mena*, 544 U.S. 93 (2005).  (Alameda Defs.' Mot. for Summ. J. at 5.)  There, the officers were investigating a gang-related drive-by shooting, and were executing a search warrant for deadly weapons and evidence of gang membership.  *Muehler*, 544 U.S. at 95-96.  During the search, officers encountered the plaintiff, placing her and three other individuals in handcuffs.  *Id.* at 96.  They remained handcuffed during the search, guarded by one or two officers.  *Id.*  The Supreme Court found that the use of handcuffs was warranted because "the case involved the detention of four detainees by two officers during a search of a gang house for dangerous weapons."  *Id.* at 100.

Likewise, in *Injeyan v. City of Laguna Beach*, the officers were investigating the plaintiff's son in relation to an acid attack, which had injured a policeman.  No. CV 12-00790 BRO (JPRx), 2013 U.S. Dist. LEXIS 201977, at *2 (C.D. Cal. Aug. 29, 2013).  The district court found that the handcuffing of the plaintiff, a seventy-one year old woman, was justified because the officers were investigating an act of domestic terrorism and there was the potential presence of chemical weapons on the premises.  *Id.* at *18.

### 1.  Plaintiff Eteghaei

The Court first considers the handcuffing of Plaintiff Eteghaei.  As an initial matter, the Alameda Defendants correctly point out that Plaintiffs fail to explain in their opposition how any Defendant other than Defendant Dormer -- the officer who handcuffed Plaintiff Eteghaei -- was involved in the handcuffing of Plaintiff Eteghaei, and thus liable for the unreasonable seizure.[7]  (*See* Alameda Defs.' Mot. for Summ. J. at 17; Alameda Defs.' Reply at 4.)  As the Court previously explained, the Ninth Circuit has found that "'a plaintiff cannot hold an officer liable because of his membership in a group without a showing of individual participation in the unlawful conduct.'  Mere presence is insufficient; rather, either integral participation or personal involvement is required before' an officer can be found liable."  (6/29/23 Dismissal Order at 5,

---

[7] Indeed, Plaintiffs fail to even identify Defendant Dormer as the officer who handcuffed Plaintiff Eteghaei; a text search of Plaintiffs' opposition fails to yield any discussion of Defendant Dormer at all. As there can be no dispute that Defendant Dormer handcuffed Plaintiff Eteghaei, the Court will analyze this claim accordingly.  (*See* Dormer Decl. ¶ 7.)

1    Dkt. No. 74 (quoting *Jones v. Williams*, 297 F.3d 930, 934, 936 (9th Cir. 2002)).)  Plaintiff fails to

2    provide any explanation for how the other officers participated in, or are otherwise liable for, the

3    handcuffing of Plaintiff Eteghaei, and the Court is not responsible for making arguments for

4    Plaintiffs.  Accordingly, the Court concludes that all other officers are entitled to summary

5    judgment as to whether Plaintiff Eteghaei was unreasonably seized.

6         As to Defendant Dormer, the Court finds there is a jury question as to whether Plaintiff

7    Eteghaei was unreasonably seized when he was handcuffed.  At the hearing, the Alameda

8    Defendants argued that the handcuffing was appropriate because per *Summers*, there is authority to

9    detain the occupants of premises while a search warrant is executed.  *See* 452 U.S. at 705.  In so

10   arguing, the Alameda Defendants effectively conflated detaining with handcuffing, arguing that it

11   is *always* appropriate to handcuff individuals during a search.  *Meredith*, however, clearly

12   distinguishes between detention and handcuffing, explaining that "handcuffing substantially

13   aggravates the intrusiveness of a detention," such that "circumstances which would justify a

14   detention will not necessarily justify a detention by handcuffing."  342 F.3d at 1063; *see also*

15   *Muehler*, 544 U.S. 93 ("The imposition of correctly applied handcuffs . . . was undoubtedly a

16   **separate** intrusion in addition to detention in the converted garage.  The detention was thus more

17   intrusive than that which we upheld in *Summers*.") (emphasis added).  Thus, it is simply not the

18   law that the authority to detain under *Summers* also includes blanket authorization to handcuff.

19        The Court finds this case is akin to *Meredith*; while Arian was accused of violent sexual

20   crimes, there was no indication of weapons on the premises.  A records check found no weapons

21   registered to Plaintiffs or Arian, no deadly weapons were used in the course of Arian's accused

22   crimes, and even Defendant Moncada's risk assessment characterized the operation as "Low" risk.

23   (Moncada Decl. ¶ 3, Exh. F at F-03, Exh. G at 1.)  Unlike *Muehler* and *Injeyan*, the search was not

24   for deadly weapons or acid, but for electronic devices that could contain evidence of Arian's

25   crimes.  (Moncada Decl., Exh. F at F-40-41.)  Given that Defendants had a picture of Arian, there

26   was no mistaking Plaintiff Eteghaei for his teenage son.  (*See* Moncada Decl., Exh. F at F-41.)

27   There was also no suggestion that there were a disproportionate number of officers to watch over

28   Plaintiffs and their son, in contrast to *Muehler*.  While Defendants argue that Plaintiff Eteghaei

United States District Court
Northern District of California

11

1    disobeyed their instructions to come out with nothing in their hands, Plaintiff Eteghaei was

2    otherwise relatively cooperative and did not appear to take any actions that would make him a

3    serious impediment to the search.  Under the totality of the circumstances, a jury could reasonably

4    find that Defendant Dormer's handcuffing of Plaintiff Eteghaei was an unreasonable seizure.

5        The Alameda Defendants also argue that qualified immunity applies in this case.

6    (Alameda Defs.' Mot. for Summ. J. at 23.)  "The doctrine of qualified immunity protects

7    government officials from liability for civil damages insofar as their conduct does not violate

8    clearly established statutory or constitutional rights of which a reasonable person would have

9    known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation omitted).  In

10   determining whether qualified immunity applies, a court must first "decide whether the fact that a

11   plaintiff has alleged or shown make out a violation of a constitutional right."  *Id.* at 232.  A court

12   then "must decide whether the right at issue was 'clearly established' at the time of defendant's

13   alleged misconduct.  Qualified immunity is applicable unless the official's conduct violated a

14   clearly established constitutional right."  *Id.*

15       The Court finds that qualified immunity is not warranted.  Rather, *Meredith* would put a

16   reasonable person on notice that their conduct violated a constitutional right.  Indeed, the only

17   meaningful distinction between *Meredith* and the instant case was that Arian was accused of

18   violent sexual assault, as opposed to non-violent tax crimes.  But again, there is no assertion that

19   Arian's crimes involved the use of deadly weapons, such that there was any specific reason why

20   the officers would have believed there to be weapons.  The Alameda Defendants also argue that

21   *Meredith* is "entirely distinguishable" because there was no arrest warrant, but it is unclear why

22   the presence of an arrest warrant would change the analysis, particularly when Defendants do not

23   suggest that they mistook Plaintiff Eteghaei for his son.

24       The Alameda Defendants' reliance on *Hartmann v. Hanson*, No. C 09-03227 WHA, 2010

25   LEXIS 5111 (N.D. Cal. Jan. 22, 2010), is unpersuasive.  There, the officers were investigating the

26   plaintiff's roommate, a convicted, non-violent sex offender, for failing to properly register his new

27   residence.  No. C 09-03227 WHA, 2010 U.S. Dist. LEXIS 5111, at *2 (N.D. Cal. Jan. 22, 2010).

28   When the plaintiff answered the door, the officers had their weapons drawn.  *Id.* at *4.  After the

United States District Court
Northern District of California

United States District Court
Northern District of California

1  plaintiff identified himself as not being the target of the arrest warrant, he was led away from the

2  door and handcuffed while his identity was verified and a warrant check performed. *Id.* at *4, 6.

3  The district court concluded that qualified immunity applied. *Id.* at *25. Importantly, however,

4  *Hartmann* did not consider *Meredith* in the qualified immunity finding, and it is not apparent that

5  the district court would have come to the same conclusion if it was considering *Meredith*.[8]

6       Accordingly, the Court concludes that Defendant Dormer is not entitled to summary

7  judgment as to the handcuffing of Plaintiff Eteghaei.

8                                    2.   Plaintiff Zade

9       A different conclusion applies to Plaintiff Zade, who was handcuffed by Defendant

10  Brandon, with assistance by Defendant Mateen. Again, the Alameda Defendants correctly

11  observe that Plaintiffs fail to explain how any other Alameda Defendant participated in the

12  handcuffing, and thus they are entitled to summary judgment. (*See* Alameda Defs.' Mot. for

13  Summ. J. at 17; Alameda Defs.' Reply at 6.)

14       Plaintiffs do not dispute that Plaintiff Zade was uncooperative prior to being handcuffed,

15  including failing to comply with commands to come towards the officers, trying to make a phone

16  call, and attempting to go back in the house. (Moncada Decl. ¶ 9; Moncada Body Camera at

17  16:36-39.) Plaintiffs also do not dispute that after being handcuffed, Plaintiff Zade continued to

18  be uncooperative, refusing to follow commands, yelling at the officers, threatening Defendant

19  Avila, slipping out of her cuffs, and falling to the ground repeatedly. (Mateen Decl. ¶¶ 5-6;

20  Brandon Decl. ¶ 5; Mangano Decl. ¶ 6; Mateen Body Camera at 16:39-40, Mateen Body Camera 2

21  at 16:43-48; Mangano Body Camera at 16:39-53; Samaniego Dep. at 61:23-62:6.) Instead,

22  Plaintiffs argued at the hearing that Plaintiff Zade was very distressed and emotional, but that she

23  did not intend to be uncooperative even if her actions could be "confused" by law enforcement as

24  being uncooperative. Plaintiff Zade's subjective state of mind, however, is not the standard; the

25  reasonableness of the forced used to effect the seizure "must be judged from the perspective of a

26

27  ─────────────────────
    [8] Notably, *Hartmann* had a "bizarre" procedural history where the plaintiff and his counsel

28  disappeared, ultimately failing to oppose the motion for summary judgment. *Id.* at *7-11. Thus,
    the case was resolved without the benefit of briefing by the plaintiff.

reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Unlike her husband, the officers could reasonably find under these circumstances that handcuffing was necessary to prevent her from impeding the search or attempting to destroy evidence, particularly given the electronic nature of the evidence being sought.

Moreover, the Court finds that Defendants Brandon and Mateen would be entitled to qualified immunity.  Here, Plaintiff Zade was uncooperative and exhibited erratic behavior both before and during her handcuffing; thus, the burden is on Plaintiffs to "identify a case that put[s the defendant] on notice that his *specific* conduct was unlawful." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021).  Plaintiffs have not.  Again, Plaintiff Zade's behavior is meaningfully distinct from *Meredith*, such that *Meredith* would not put a reasonable person on notice that their behavior violated a constitutional right.  Plaintiffs also cite *Franklin v. Foxworth*, where the Ninth Circuit found that the officers executed a warrant in an unreasonable manner by removing a gravely ill and semi-naked man from his sickbed without providing any covering, before forcing him to sit handcuffed in his living room for two hours even after his room had been searched.  31 F.3d 873, 876-77 (9th Cir. 1994).  The Ninth Circuit emphasized that the plaintiff presented little risk of danger, was absolutely no risk of flight, and was highly unlikely to interfere with their search in any way.  *Id.* at 877.  Here, Plaintiff was neither gravely ill nor semi-naked, and she was uncooperative and able to interfere with the search.  Finally, Plaintiffs argue that they were outside their home when they were handcuffed, and that the Alameda Defendants cannot cite any cases permitting handcuffing under such circumstances.  (Pls.' Opp'n at 12.)  This is not the burden for qualified immunity; it is Plaintiffs who must identify a relevant case that would put Defendants on notice.  Because Plaintiffs have not, the Alameda Defendants are entitled to summary judgment as to the handcuffing of Plaintiff Zade.  *See Rivas-Villegas*, 595 U.S. at 6 (finding that qualified immunity applied where the plaintiff failed to identify any binding authority "that addresses facts like the one at issue here").

b.  University Defendants

First, Plaintiffs appear to argue that the University Defendants are liable for the Alameda

Defendants' handcuffing of Plaintiffs when executing the warrants because they obtained the search warrant.  (Pls.' Opp'n at 22.)  In so arguing, Plaintiffs suggest that the University Defendants have "supervisory control" of the Alameda Defendants pursuant to *Ogborn v. City of Lancaster*, 101 Cal. App. 4th 448 (2002).  (*Id.*)  The Court previously rejected this argument, explaining that *Ogborn* "did not speak to supervisory liability.  Rather, *Ogborn* held that 'officers who lead the team that executes a warrant are responsible for ensuring that they have lawful authority for their actions.  A key aspect of this responsibility is making sure that they have a proper warrant that in fact authorizes the search and seizure they are about to conduct.'"  (6/29/23 Dismissal Order at 9 (quoting *Ogborn*, 101 Cal. App. 4th at 459).)  The Court thus found that "[t]he fact that the individual University Defendants were responsible for ensuring an adequate search warrant . . . does not mean that the individual University Defendants automatically became the supervisor of all individuals involved in the execution of the search warrant[.]"  (*Id.*)  Plaintiffs fail to acknowledge the Court's prior ruling, let alone explain why it was incorrect.  Accordingly, the Court finds that Plaintiffs cannot demonstrate that the University Defendants are liable for the Alameda Defendants' alleged constitutional violations simply because they obtained the underlying search warrant.

Second, Plaintiffs argue that Defendant Samaniego violated Plaintiff Zade's constitutional rights by directing the officers to keep Plaintiff Zade in handcuffs, even though she "knew, or should have known, that this was a constitutional violation."  (Pls.' Opp'n at 22-23.)  As discussed above, there was no constitutional violation.  Further, Defendant Samaniego would be entitled to qualified immunity because Plaintiffs fail to identify any case law where an officer was found liable for a constitutional violation where they ordered an individual remain handcuffed after hearing the individual make threats towards another officer, causing them to feel it was unsafe to uncuff the individual.  (*See* Samaniego Dep. at 61:23-62:18.)

Accordingly, the University Defendants are entitled to summary judgment as to the unreasonable seizure claim.

### ii.    Unreasonable Force

Plaintiffs argue that the Alameda Defendants used unreasonable force when they pointed

1   rifles and other weapons at them.  (Pls.' Opp'n at 7.)  Plaintiffs make no arguments as to the

2   University Defendants, nor do they provide any evidence that contradicts the University

3   Defendants' evidence that they were not even present when the rifles were pointed at Plaintiffs.

4   (Samaniego Dep. at 68:21-23, 71:8-12; Avila Dep. at 98:15-18; Levette Dep. at 33:17-23, 36:15-

5   25.)  Accordingly, the University Defendants are entitled to summary judgment as to the

6   unreasonable force claim.

7          The Alameda Defendants first argue that the evidence shows that the only officer who

8   pointed a weapon at Plaintiffs was Defendant Walter.  (Alameda Defs.' Mot. for Summ. J. at 19.)

9   Plaintiffs respond that Defendants Moncada and Mateen also pointed their weapons at Plaintiff

10  Eteghaei, citing to Defendant Dormer's body camera footage.  (Pls.' Opp'n at 3.)  The Court has

11  reviewed this portion of the body camera footage, and it does not appear to show either

12  Defendants Moncada or Mateen pointing their weapons at Plaintiffs' direction.  Likewise, review

13  of Defendant Mateen's body camera footage shows no time where either Defendant pointed their

14  weapons at Plaintiffs; rather, it shows Defendant Mateen pointing his rifle as the residence's upper

15  floor windows when Defendant Walter was confronting Plaintiff Eteghaei, and with his rifle not

16  being held up when he was speaking to Plaintiff Zade.  (*See* Mateen Body Camera at 16:36-38.)

17  Plaintiffs also assert that Defendant Walter's body camera footage supports their position, but

18  provides no citation except "*supra*."  (*Id.* at 7.)  This is not sufficient; the Court is not required to

19  review the entirety of body camera footage to see if it supports Plaintiffs' position.  In any case,

20  the Court did review the relevant Walter footage, which only shows Defendant Walter pointing an

21  assault rifle in Plaintiffs' direction.  (Walter Body Camera at 16:36.)  Accordingly, the Court finds

22  that except for Defendant Walter, the other individual Alameda Defendants are entitled to

23  summary judgment as to the unreasonable force claim.

24         The Alameda Defendants argue that law enforcement may use reasonable force while

25  executing a search warrant, again citing to *Muehler*.  (Alameda Defs.' Mot. for Summ. J. at 19.)

26  The Court finds that with respect to Defendant Walter's initial pointing of the rifle in both

27  Plaintiffs' direction, the Alameda Defendants are entitled to summary judgment.  At that point,

28  Plaintiffs had only just come out of the house; a reasonable officer would require some time to

United States District Court
Northern District of California

16

1   assess the situation before lowering his weapon, including whether Plaintiffs were the target of the

2   arrest warrant or a potential threat. *See Injeyan*, 2013 U.S. Dist. LEXIS 201977, at *17-18

3   ("Requiring [the use of] less force would have demanded that [the officer] exercise 'superhuman

4   judgment' in a tense and uncertain situation, which the U.S. Constitution does not require.").

5         That said, the Court finds a different conclusion applies after Defendant Walter first

6   lowered his weapon. (*See* Walter Body Camera at 16:36:33.) At that point, Defendant Walter had

7   presumably found that Plaintiffs were not a threat, or he would not have found it safe enough to

8   lower his weapon for several seconds. Yet Defendant Walter then continued to orient his weapon

9   at Plaintiff Eteghaei's head until Plaintiff Eteghaei was handcuffed. Again, the Court must

10  consider all of the circumstances that were known by the officers at this time. While the Alameda

11  Defendants continue to point to Arian being a suspect in multiple rapes, there was no evidence of

12  weapons and the search warrant was for electronic devices. (Alameda Defs.' Mot. for Summ. J. at

13  19.) The Alameda Defendants also assert that both Plaintiffs exited the home with cell phones in

14  their hands, but it is unclear this would increase the danger to the point that Defendant Walter

15  would find it necessary to again point his gun at Plaintiff Eteghaei after lowering it. (*Id.* at 20.)

16  Further, the Alameda Defendants contend that Plaintiffs exited the home before Arian did, but fail

17  to explain why this would warrant pointing a gun at Plaintiff Eteghaei once they determined that

18  he was clearly not their teenage son. (*Id.*) In short, whether this constitutes unreasonable force is

19  a question of fact for a jury.

20        As to qualified immunity, again, the Court previously pointed to the Ninth Circuit's ruling

21  in *Robinson v. Solano County*, where the officers were responding to a report that the plaintiff was

22  carrying a shotgun and had just shot two dogs, and was yelling in the middle of the street. 278

23  F.3d 1007 (9th Cir. 2002). When the plaintiff came out, the officers unholstered their guns, with

24  one officer pointing a gun at the plaintiff's head. *Id.* The Ninth Circuit found: "The development

25  of the law with respect to arrests and detentions now allows us to recognize as a general principle

26  that pointing a gun to the head of an apparently unarmed suspect during an investigation can be a

27  violation of the Fourth Amendment, especially where the individual poses no particular danger."

28  278 F.3d 1007, 1015 (9th Cir. 2002). This would put a reasonable person on notice that pointing a

United States District Court
Northern District of California

gun at the head of an unarmed individual -- not even the suspect -- would constitute a constitutional violation, particularly when the individual was generally compliant.  Indeed, Plaintiff Eteghaei's actions were arguably less threatening than in *Robinson*, as there was no suggestion that he had personally been violent or was carrying any weapons.  Notably,  even in *Hartmann* (which the Alameda Defendants heavily rely upon), the district court observed "that if sworn facts had demonstrated that defendant Hanson had kept his weapon drawn and pointed at plaintiff *after* it was determined that plaintiff was unarmed, cooperative, and not a serious threat to officer safety," its finding that there was no excessive force "would likely be different under *Robinson*."  2010 U.S. Dist. LEXIS 5111, at *30 n.6; *see also Thompson v. Rahr*, 885 F.3d 582, 587 (9th Cir. 2018) ("pointing guns at persons who are compliant and present no danger is a constitutional violation").  Such is the case here.  Accordingly, the Court concludes that Defendant Walter is not entitled to summary judgment as to Plaintiff Eteghaei's unreasonable force claim.

### iii.  *Monell Claims*

To the extent Plaintiffs purport to bring any *Monell* claims in the operative complaint, these claims were previously dismissed with prejudice.  (2/17/23 Dismissal Order at 4-5 (dismissing *Monell* claim against Defendant UC Regents because it is not a municipal entity); 9/25/23 Dismissal Order at 9 (dismissing *Monell* claim against Defendant Alameda County because Plaintiffs "cite no facts connecting the policy with the violation).)  Plaintiffs do not acknowledge this dismissal, let alone dispute it.[9]

Accordingly, the Court concludes that Defendants County of Alameda and UC Regents are entitled to summary judgment on the *Monell* claims (which should never have been pled in the operative complaint).

### C.  Claim 2: Supervisory Liability

Plaintiff brings a claim for § 1983 "supervisory liability" against Defendants Farruggia,

---

[9] In any case, Plaintiffs' argument on this issue is incomprehensible, citing to Dkt. No. 25 (a stipulation to extend the time to file an opposition to a motion to dismiss) and asserting without any authority that the University Defendants' claim that they did not witness a constitutional violation is somehow circumstantial evidence of a custom or practice for committing unconstitutional acts.  (Pls.' Opp'n at 25.)

1   Levette, Samaniego, and Avila.  "Under Section 1983, supervisory officials are not liable for

2   actions of subordinates on any theory of vicarious liability."  *Hansen v. Black*, 885 F.2d 642, 645-

3   46 (9th Cir. 1989).  Rather, "[a] supervisor is only liable for constitutional violations of his

4   subordinates if the supervisor participated in or directed the violations, or knew of the violations

5   and failed to act to prevent them."  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

6         **i.   Defendant Farruggia**

7         With respect to Defendant Farruggia, Plaintiffs assert that Defendant Farruggia also

8   engaged in excessive force because he displayed a firearm at Plaintiffs.  (Pls.' Opp'n at 14.)  In

9   support, Plaintiffs point to video footage of officers on Plaintiffs' porch pointing guns at their

10  residence, but this footage is from *after* Plaintiffs were removed from the area.  (*See* Moncada

11  Body Camera at 16:40.)  This does not support a finding of liability.

12        In the alternative, Plaintiffs argue that Defendant Farruggia planned and supervised the

13  raid, and that he was the highest ranking officer at the execution of the warrants but that he did

14  nothing to stop the unconstitutional actions of his subordinates, such as Defendant Walter.  (Pls.'

15  Opp'n at 14.)  The Alameda Defendants, in turn, respond that there is no underlying constitutional

16  violation, Defendant Farruggia is entitled to qualified immunity, and that there is no *Monell* claim.

17  (Alameda Defs.' Reply at 14.)  As discussed above, however, there is a viable claim for

18  unreasonable seizure and unreasonable force as to Plaintiff Eteghaei.  There is no dispute that

19  Defendant Farruggia was the operational commander for executing the search warrant, that he was

20  present at the scene, and that he was in a position to witness the alleged constitutional violations at

21  issue.  (Farruggia Decl. ¶¶ 2-3, 6, Dkt. No. 117-3.)  There is also no dispute that he did not

22  intervene to stop the unconstitutional actions of his subordinates.  Accordingly, the Court

23  concludes that Defendant Farruggia is not entitled to summary judgment as to supervisory

24  liability.

25        **ii.   University Defendants**

26        To the extent Plaintiffs assert that the University Defendants had supervisory liability over

27  officers in a different police department based on their obtaining the search warrant, the Court has

28  already explained why this lacks merit.  In the alternative, Plaintiffs argue there is no dispute that

United States District Court
Northern District of California

1  Defendant Levette had supervisory control over Defendants Samaniego and Avila, but did nothing

2  to prevent Defendant Samaniego from stating that Plaintiff Zade should remain handcuffed.  (Pls.'

3  Opp'n at 23.)  As discussed above, Plaintiffs cannot establish a constitutional violation as to

4  Defendant Samaniego's decision to keep Plaintiff Zade handcuffed.  Further, Plaintiffs cite no

5  evidence that Defendant Levette was present when Defendant Samaniego made this decision.

6  Thus, Plaintiffs have failed to establish that Defendant Levette knew of a violation but failed to

7  prevent it.  Accordingly, the Court concludes that the individual University Defendants are entitled

8  to summary judgment as to supervisory liability.

9          **D.**    **Violation of California Constitution, Article I, § 13**

10      "Article I, section 13 guarantees the right to be free from unreasonable searches and

11  seizures."  *Roy v. Cnty. of L.A.*, 114 F. Supp. 3d 1030, 1042 (C.D. Cal. 2015).  This provision

12  "parallels the Fourth Amendment inquiry[.]"  *Sanchez v. Cnty. of San Diego*, 464 F.3d 916, 928-

13  29 (9th Cir. 2006); *see also Ingersoll v. Palmer*, 43 Cal. 3d 1321, 1329 (1987) ("The touchstone

14  for all issues under the Fourth Amendment and article I, section 13 of the California Constitution

15  is reasonableness.").

16      The Alameda Defendants argue that Plaintiffs' claim fails because they were acting on a

17  proper warrant.  (Alameda Defs.' Mot. for Summ. J. at 29.)  The Court previously rejected this

18  argument because Plaintiffs did not appear to bring a claim based on an unreasonable search or a

19  defective warrant.  (9/25/23 Order at 10.)  Rather, Plaintiffs rely on how the search warrant was

20  executed, including whether the Alameda Defendants impermissibly detained Plaintiffs.  (Pls.'

21  Opp'n at 15.)  As the Court has found that Plaintiff Eteghaei's claim for unreasonable seizure

22  survives summary judgment, this claim survives as to Defendant Dormer.  In contrast, because

23  Plaintiffs identify no other individual involved in the handcuffing of Plaintiff Eteghaei, and fail to

24  explain how Defendant County of Alameda would be held liable for Defendant Dormer's actions,

25  summary judgment is appropriate as to all other Defendants.

26      In the alternative, the Alameda Defendants argue that Plaintiffs' damages claim fails

27  because Article I, § 13 does not permit money damages.  (Alameda Defs.' Mot. for Summ. J. at

28  29.)  At the hearing, however, counsel for the Alameda Defendants conceded that money damages

would be available.  *See also Ordonez v. Stanley*, 495 F. Supp. 3d 855, 866-67 (C.D. Cal. 2020) (explaining that the California Supreme Court in *Katzberg v. Regents of the University of California*, 29 Cal. 4th 300 (2002), "recognized the history of Section 13 supported a damages action").  Accordingly, the Court finds that Plaintiff Eteghaei can seek money damages under Article I, § 13.

### E.      Claims 5 and 6: Violation of Bane Act and Conspiracy to Violate Bane Act

"The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out by threats, intimidation or coercion."  *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018).

#### i.      University Defendants

Plaintiffs have not established a constitutional violation by the University Defendants. Thus, the Bane Act claim against the University Defendants necessarily fails.  *See Williamson v. City of Nat'l City*, 23 F.4th 1146, 1155 (9th Cir. 2022).  For the conspiracy claim, Plaintiffs appear to assert that there is a factual dispute as to whether the individual University Defendants had input on how the County planned to execute the warrants.  (Pls.' Opp'n at 23-24.)  In support, Plaintiffs point to the fact that Defendant Samaniego sent a draft operations plan to Defendant Moncada.  (*Id.* at 24.)  While this is undisputed, this does not necessarily mean that the Alameda Defendants *used* Defendant Samaniego's draft operations plan.  Indeed, Defendant Moncada stated that he had drafted the operations plan, which included the use of rifles, a ram, and cutters. (Moncada Decl., Exh. G at 6-8.)  Plaintiffs cite no evidence disputing that the individual University Defendants did not provide comments on this operations plan, nor do they explain how either the Defendant Samaniego's draft operations plan or Defendant Moncada's operations plan necessarily resulted in a constitutional violation.  It does not appear that Defendant Samaniego's draft operations plan included the use of any weapons, while Defendant Moncada's operations plan does not appear to detail how the weapons would be used.  Plaintiffs do not point to any evidence that the individual University Defendants discussed the level of force that would actually be used at the operations meeting.  In short, Plaintiffs have not produced any evidence that would permit a reasonable trier of fact to find that the University Defendants knew that Defendant Walter

1    would point a rifle at Plaintiff Eteghaei or that Defendant Dormer would handcuff Plaintiff

2    Eteghaei, regardless of his compliance or whether he posed a threat.  Accordingly, the Court

3    concludes that the University Defendants are entitled to summary judgment as to the Bane Act

4    claims.

5                 ii.    **Alameda Defendants**

6         First, the Alameda Defendants seek summary judgment as to the Bane Act claims because

7    there is no constitutional violation.  (Alameda Defs.' Mot. for Summ. J. at 30.)  As discussed

8    above, the Court finds that Plaintiff Eteghaei has raised a triable issue as to whether his

9    constitutional rights were violated.

10        Second, the Alameda Defendants argue there is no evidence showing that the individual

11   Defendants acted with specific intent.  (Alameda Defs.' Mot. for Summ. J. at 30-31.)  In the

12   context of an excessive force claim, "a mere intention to use force that the jury ultimately finds

13   unreasonable . . . is insufficient.  Rather, the jury must find that the defendants intended not only

14   the force, but its unreasonableness, its character as more than necessary under the circumstances."

15   *Reese*, 888 F.3d at 1045.  In *Reaza v. County of Riverside*, four officers responded to a 911 call at

16   the plaintiff's home, during which they handcuffed and used force on the plaintiff's son, resulting

17   in his death.  No. 5:20-cv-01188-MEMF (SPx), 2022 U.S. Dist. LEXIS 198653, at *2-3 (C.D. Cal.

18   Oct. 26, 2022).  The district court found that there was a genuine dispute as to whether the

19   defendants had a specific intent to violate the son's Fourth Amendment rights, which would

20   require a jury to consider the amount of force used, the nature of the force, and the nature of the

21   dialogue by the individual defendants.  *Id.* at *59.  Likewise, the Court here has found that

22   Plaintiff Eteghaei has raised a triable issue as to whether Defendant Walter violated his Fourth

23   Amendment rights, requiring a jury to consider whether the amount of force used and the nature of

24   the force was more than necessary under the circumstances.  *See also Reese*, 888 F.3d at 1035,

25   1045 (finding that a reasonable jury could find that the defendant had a specific intent to violate

26   the plaintiff's Fourth Amendment rights where the defendant shot the plaintiff).  Accordingly, the

27   Court concludes that Defendant Walter is not entitled to summary judgment on the Bane Act

28   claim.

*United States District Court*
*Northern District of California*

1       Finally, as to conspiracy, the Alameda Defendants provide no legal argument.  Instead,

2   their entire argument is as follows: "There is absolutely no evidence to support the argument that

3   [the Alameda Defendants] acted with the specific intent or conspired with UCSB PD to interfere

4   or attempt to interfere with the Plaintiff's constitutional right by threats, intimidation, or coercion.

5   Thus, Plaintiffs' claim against the [Alameda Defendants] for violating and conspiring to violate

6   the Tom Bane Act fail."  (Alameda Defs.' Mot. for Summ. J. at 30-31.)  This conclusory

7   statement, which fails to explain what is required to establish conspiracy, is insufficient to satisfy

8   the Alameda Defendants' burden at summary judgment.

9       In the absence of any legal argument or analysis by the Alameda Defendants, it is not

10  apparent to the Court that the Alameda Defendants are entitled to summary judgment as to the

11  conspiracy claim.  While the Court disagrees with Plaintiffs (as discussed above) that attendance

12  at the operational meeting is sufficient to establish conspiracy, the Alameda Defendants were

13  working alongside Defendant Walter when he pointed his assault rifle at Plaintiff Eteghaei, but did

14  nothing to stop him.  This participation in the operation, during which many of the officers were

15  pointing weapons, giving instructions to one another, and cooperating to execute the warrants,

16  may be sufficient for a jury to find conspiracy.  *See Allen v. Cnty. of Lake*, Case No. 14-cv-3934-

17  TEH, 2015 U.S. Dist. LEXIS 12091, at *13-14 (N.D. Cal. Feb. 2, 2015) (finding sufficient

18  allegations of conspiracy because the defendants were "allegedly either present (plausibly

19  inferring involvement . . . ) or directly took part in the searches of Plaintiffs' properties and the

20  eradication of their marijuana").  Accordingly, the Court concludes that the Alameda Defendants

21  are not entitled to summary judgment as to the Bane Act conspiracy claim.

22          **F.    Claim 7: Negligent Hiring, Training, and Supervision**

23      Plaintiffs bring negligent hiring, training, and supervision claims as to Defendants

24  Farruggia and Mateen.  Under this claim, Plaintiffs must establish that these Defendants'

25  negligence in either hiring or supervising resulted in the constitution violation at issue.  *Doe v.*

26  *Capital Cities*, 50 Cal. App. 4th 1038, 1054 (1996).

27      With respect to Defendant Farruggia, the Court has found that Plaintiff Eteghaei has raised

28  a triable issue as to whether he failed to intervene in the alleged violations, despite being a witness

United States District Court
Northern District of California

to the complained of acts.  To be clear, this is not a finding of liability based on vicarious liability; liability would be based on Defendant Farruggia's own actions.  Thus, Cal. Gov. Code § 820.8's prohibition on vicarious liability does not apply.  (*See* Alameda Defs.' Mot. for Summ. J. at 31.)  As to Defendant Mateen, however, Plaintiffs fail to provide any explanation for how Defendant Mateen was responsible for hiring, training, or supervising the other officers.  (*See* Pls.' Opp'n at 18.)  Thus, it is unclear why he would be liable for their actions.  Accordingly, the Court concludes that Defendant Mateen is entitled to summary judgment as to the negligent hiring, training, and supervision claim, but that Defendant Farruggia is not.

### G.    Claims 8 and 9: Assault and Battery

"Assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on another."  *Finley v. City of Oakland*, No. C 04-5102 MEJ, 2006 U.S. Dist. LEXIS 6623, at *39 (N.D. Cal. Feb. 2, 2006).  Battery, in turn, "is any willful or unlawful use of force or violence upon another that causes injury."  *Id.*  "Where a police officer is the defendant, the plaintiff must prove unreasonable force as an additional element of these torts."  *Id.* at *40 (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272 (1998); *see also Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999) ("A prima facie case for battery is not established under California law unless the plaintiff proves that an officer used unreasonable force against him to make a lawful arrest or detention.").

The Alameda Defendants argue that because they used reasonable force, the state law claims for assault and battery must be dismissed.  (Alameda Defs.' Mot. for Summ. J. at 32.)  The University Defendants, in turn, argue that they did not use any unreasonable force against Plaintiffs.  (University Defs.' Mot. for Summ. J. at 31.)  As discussed above, the Court finds there is a triable issue as to whether Defendant Walter used unreasonable force against Plaintiff Eteghaei, as well as whether Defendant Dormer's handcuffing of Plaintiff Eteghaei was unreasonable.  Thus, the Court finds that all Defendants are entitled to summary judgment on the assault and battery claims except Defendant Walter as to Plaintiff Eteghaei's assault claim and Defendant Dormer as to Plaintiff Eteghaei's battery claim.

United States District Court
Northern District of California

24

### H.    Claim 10: Intentional Infliction of Emotional Distress

To establish intentional infliction of emotional distress, a plaintiff must demonstrate: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001 (1993) (internal quotation omitted).  To constitute outrageous conduct, the conduct "must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.*

With respect to the University Defendants, the Court finds that summary judgment is warranted.  As the University Defendants point out, their only interaction with Plaintiffs at the scene was Defendant Samaniego's decision to keep Plaintiff Zade in handcuffs, a decision that was reasonable under the circumstances.  (University Defs.' Mot. for Summ. J. at 32.)  Plaintiffs provide no response to this.

As to the Alameda Defendants, the parties dispute whether there is any evidence that they intended on causing or acting with reckless disregard to causing Plaintiffs to suffer emotional distress.  (Alameda Defs.' Mot. for Summ. J. at 32.)  Plaintiffs argue that "[b]ased on the defendants' consistent citations to Arian's case, even when he is not a party to this action, strongly suggest that this execution of the warrants was intentionally designed to embarrass and humiliate his parents." (Pls.' Opp'n at 20.)  Plaintiffs cite no legal authority in support, nor do they cite evidence.  It is not clear how the Court can simply assume that citations to Arian's case -- the very reason for the warrants at issue and why Defendants were at Plaintiffs' residence -- demonstrates an intent to cause Plaintiffs emotional distress.  Unsupported arguments in a brief are insufficient to demonstrate intent.  Accordingly, the Court finds that the Alameda Defendants are entitled to summary judgment on the intentional infliction of emotional distress claim.

### I.    Claims 11 and 12: Negligent Infliction of Emotional Distress and Negligence

"Unlike the intentional formulation, [negligent infliction of emotional distress] 'is a form of the tort of negligence, to which the elements of duty, breach of duty, causation and damages apply." *Burnell v. Marin Humane Soc'y*, Case No. 14-cv-5635-JSC, 2015 U.S. Dist. LEXIS

150607, at *65 (N.D. Cal. Nov. 5, 2015) (quoting *Huggins v. Longs Drugs Stores Cal, Inc.*, 6 Cal. 4th 124, 129 (1993).)  Defendants argue that Plaintiffs fail to identify a breach of duty.  (Alameda Defs.' Mot. for Summ. J. at 33; University Defs.' Mot. for Summ. J. at 32.)  In response, Plaintiffs state: "Aside from the fact that it is the announced policy of the Alameda County police to 'protect and serve' its population, **cite**, which should answer the duty of care, they clearly breached that duty in this case." (Pls.' Opp'n at 20.)  Plaintiffs cite no legal authority that "the announced policy" of a police department (for which Plaintiff also includes no evidentiary support) creates a duty of care.  In the alternative, Plaintiffs complain that Defendants cite no evidence of the lack of a breach of duty of care.  (*Id.*)  This misapprehends the summary judgment standard; as the party with the burden of proving the claim, it is Plaintiffs who are obliged to identify the relevant evidence.  As Plaintiffs have not, the Court concludes that summary judgment is warranted on this claim.

### J.    Claims 13 and 14: False Imprisonment and False Arrest

"False arrest and false imprisonment are not separate torts; rather, false arrest is one way to commit a false imprisonment."  *Finley*, 2006 U.S. Dist. LEXIS 6623, at *37.  "Under California law, the elements of a claim for false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief."  *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1169 (9th Cir. 2011).

Here, the question is whether the detention was reasonable.  As discussed above, there is a triable issue as to whether Plaintiff Eteghaei was unreasonably seized based on the use of handcuffs.  Alameda Defendants assert immunity under California Government Code § 820.2[10] based on an exercise of discretion, but the Ninth Circuit has specifically found that "section 820.2 immunity does not apply to an officer's decision to detain or arrest a suspect."  *Liberal v. Estrada*, 632 F.3d 1064, 1084 (9th Cir. 2011).  Rather, immunity under § 820.2 "is reserved for those basic

---

[10] At the hearing, Alameda Defendants asserted that they are entitled to immunity under various state statutes.  In their briefing, however, the only discussion of such immunity was the application of § 820.8 (vicarious liability for the actions of others) to the negligent training, hiring, and supervision claim, as well as the application of § 820.2 to false imprisonment and arrest.  (*See* Alameda Defs.' Mot. for Summ. J. at 31, 33.)

United States District Court
Northern District of California

1   policy decisions which have been expressly committed to coordinate branches of government."

2   *Id.* (internal quotation omitted).  Thus, "[a] police officer's decision to detain or arrest a suspect is

3   not a basic policy decision, but only an operational decision by the police purporting to apply the

4   law."  *Id.* at 1084-85 (finding that § 820.2 did not apply to false imprisonment or false arrest

5   claims based on an officer detaining a suspect without reasonable suspicion or probable cause).

6   Here, the decision to handcuff Plaintiff Eteghaei was not a basic policy decision, but an

7   application of the law.  Thus, there is a claim for false imprisonment/false arrest as to Defendant

8   Dormer.  Otherwise, the Court finds that the other Defendants are entitled to summary judgment

9   on these claims.

10  **K.   Claim 15: Violation of California Government Code § 7286(b)(5)**

11       Plaintiffs bring a claim for violation of California Government Code § 7286(b)(5) against

12  Defendant County of Alameda.  California Government Code § 7286(b)(5) requires that law

13  enforcement agencies maintain a policy providing a minimum standard on the use of force,

14  including clear and specific guidelines regarding situations in which officers may or may not draw

15  or point a firearm.  Defendant County of Alameda argues that the claim is moot because its current

16  use of force policy is in compliance.  (Alameda Defs.' Mot. for Summ. J. at 35.)

17       Plaintiffs do not respond in any meaningful way.  Instead, the entirety of Plaintiffs'

18  argument reads: "The California Legislature enacted Government Code Section 7286 precisely for

19  situations such as this one, to prevent armed officers from brandishing their firearms at persons

20  with the possibility of killing them.  The Alameda County's refusal to recognize this issue does

21  not shroud them with summary judgment."  (Pls.' Opp'n at 21-22.)

22       In short, there does not appear to be any dispute that Defendant County of Alameda is in

23  compliance with § 7286(b)(5).  Nor do Plaintiffs provide any legal authority that the correction of

24  past non-compliance would defeat this claim.  Accordingly, the Court concludes that summary

25  judgment is warranted.

26  **IV.   CONCLUSION**

27       For the reasons stated above, the Court GRANTS the University Defendants' motion for

28  summary judgment in full.  The Court GRANTS IN PART and DENIES IN PART the Alameda

27

Defendants' motion for summary judgment.  Specifically, the Court DENIES summary judgment as to the following:

      (1)   Plaintiff Eteghaei's Fourth Amendment claim for unreasonable seizure against Defendant Dormer based on the handcuffing;

      (2)   Plaintiff Eteghaei's Fourth Amendment claim for unreasonable force against Defendant Walter based on the pointing of the rifle at him;

      (3)   Plaintiff Eteghaei's supervisory liability claim against Defendant Farruggia;

      (4)   Plaintiff Eteghaei's California Constitution, Article I, § 13 claim against Defendant Dormer;

      (5)   Plaintiff Eteghaei's Bane Act claim against Defendant Walter;

      (6)   Plaintiff Eteghaei's conspiracy to commit a Bane Act violation against Alameda Defendants;

      (7)   Plaintiff Eteghaei's negligent hiring, training, and supervision claim against Defendant Farruggia;

      (8)   Plaintiff Eteghaei's assault claim against Defendant Walter;

      (9)   Plaintiff Eteghaei's battery claim against Defendant Dormer; and

      (10) Plaintiff Eteghaei's false imprisonment/false arrest claim against Defendant Dormer.

The Court finds that the Alameda Defendants are otherwise entitled to summary judgment on the remaining claims, including all claims brought by Plaintiff Zade.

      IT IS SO ORDERED.

Dated: October 16, 2024

_____
KANDIS A. WESTMORE
United States Magistrate Judge